**FALKENBERG CAPITAL CORPO- RATION, a Colorado corpora- tion, Plaintiff,**

v.

**DAKOTA CELLULAR, INC., a Delaware corporation, Defendant.**

**Civil A. No. 95–351 MMS.**

United States District Court, D. Delaware.

Feb. 6, 1996.

Opinion Denying Motion to Alter Judgment May 6, 1996.

Alan J. Stone, and S. Mark Hurd, of Morris, Nichols, Arsht & Tunnell, Wilmington, Delaware; Timothy R. Beyer, and Peter J. Korneffel, Jr., of Baker & Hostetler, Denver, Colorado, of counsel, for plaintiff.

James M. Mulligan, Jr., of Connolly, Bove, Lodge & Hutz, Wilmington, Delaware; Paul C. Besozzi, and Kevin P. Sherburne, of Besozzi, Gavin, Craven & Schmitz, Washington, D.C., of counsel for defendant.

### *MEMORANDUM OPINION*

MURRAY M. SCHWARTZ, Senior District Judge.

### I. Introduction

Before the Court is a motion to dismiss, pursuant to Federal Rule of Civil Procedure 12(b)(6), by defendant Dakota Cellular, Inc. ("Dakota") for failure to state a claim upon which relief can be granted ("Motion to Dismiss"). Docket Item ("D.I.") 5. Plaintiff Falkenberg Capital Corporation ("Falkenberg") has filed a complaint, D.I. 1, requesting relief for breach of contract or, alternatively, quantum meruit. The underlying dispute involves a listing agreement entered into by the parties on May 3, 1994, in which Falkenberg agreed to be the exclusive sales agent on behalf of Dakota, in order to procure a buyer for Dakota's non-wireline cellular system serving the South Dakota 3 Rural Service Area. Jurisdiction is based on diversity of citizenship, 28 U.S.C. § 1332.

### II. Factual Background

Falkenberg is a Colorado corporation which provides brokerage services on behalf

of sellers of non-wireline cellular businesses. D.I. 1 ¶ 1. Its principal place of business is Denver, Colorado. *Id.* Dakota is a Delaware corporation with its principal place of business in Aberdeen, South Dakota. *Id.* ¶ 2. Dakota owns the non-wireline cellular system serving the South Dakota 3 Rural Service Area (the "Cellular System"), including the Federal Communications Commission ("FCC") non-wireline cellular authorization. *Id.* ¶ 5.

Following various unsuccessful efforts to sell the Cellular System, Dakota retained Falkenberg as its exclusive sales agent. *Id.* ¶ 6. By an agreement entered into on May 3, 1994, (the "Listing Agreement"), Falkenberg agreed to act as the exclusive sales agent for the sale of the properties and assets of Dakota in exchange for a commission, to be paid by Dakota, conditioned upon the procurement of a buyer and the consummation of the sale, within a specified time period. *Id.* ¶¶ 7, 8. The provision in the Listing Agreement relating to Falkenberg's commission provides as follows:

> 5. The Company [Falkenberg] will be entitled to a commission, computed in the manner set forth below, if (a) during the Term an agreement is entered into with anyone to sell the Assets or Interests and the transaction contemplated by such agreement is consummated whether or not such consummation occurs during the Term, or (b) within six months after the Term of this Agreement an agreement is entered into to sell the Assets or Interests to an Identified Buyer and the transaction contemplated by such agreement is consummated.

The term of the Listing Agreement, as stated in paragraph 1 therein, was to last for a period of 180 days, commencing on May 3, 1994, and was renewable for successive periods of thirty days by agreement between the parties (the "Term"). D.I. 1, Exhibit ("Exh.") A, ¶ 1. Both parties had the express right to terminate the Listing Agree-

ment, provided that within at least ten days prior to the end of the Term, the terminating party provides written notice to the other. *Id.* The Listing Agreement also provided that during the six month period which follows the Term (the "Protection Period"), Falkenberg may still be entitled to a commission, if certain conditions are met. *Id.* ¶ 5.

Falkenberg expended much time and effort in procuring a buyer for the Cellular System. It conducted a confidential survey of more than thirty prospective buyers and prepared sales presentation documents in connection with the sale. *Id.* ¶ 10. On October 14, 1994, Dakota wrote a letter to Falkenberg informing Falkenberg that Dakota wished to exercise its right to terminate the Listing Agreement, effective as of October 30, 1994. *Id.* ¶ 12. On November 8, 1994, Falkenberg sent Dakota a list of 32 potential purchasers (the "Identified Buyer List"), each of whom was considered an "Identified Buyer" under paragraph 3 of the Listing Agreement. *Id.* ¶ 10. One such purchaser was Western Wireless Corporation ("Western Wireless"), who was listed on the Identified Buyer List as "General Cellular Corp/Western Wireless." *Id.* at Exh. B.

As of October 30, 1994, Dakota and Western Wireless were unable to agree on a purchase price for the Cellular System. On December 16, 1994, the two companies entered into a preliminary arrangement for the purpose of setting forth some of the provisions of the purchase and sale, which stated that subject to the execution of a Definitive Purchase and Sale Agreement (the "Definitive Agreement"), Western Wireless or an affiliated entity would purchase the Cellular System for $3.5 million. *Id.* ¶ 14.[1] On January 5, 1995, Dakota filed a request with the FCC for approval to transfer the Cellular System authorization to GCC License Corporation ("GCC License"), an affiliate of Western Wireless. *Id.* ¶ 15. On March 24, 1995, the FCC provided public notice that, effective March 22, 1995, Dakota's application to

---

**1.** The parties dispute the nature of this December agreement. Falkenberg refers to the agreement as the "December Agreement," alleging that it contained all significant provisions except the precise amount and nature of the purchase price holdback. *Id.* ¶ 14. Dakota, however, believes

that the December agreement was neither an agreement nor a letter of intent. D.I. 8 at 8–9. Dakota argues that the letter was nothing more than a "preliminary effort to sell Dakota Cellular's cellular system to Western Wireless, without binding or obligating either party." *Id.* at 9.

assign the Cellular System to GCC License was granted. *Id.* ¶ 16. During this period of finalization and federal authorization, Falkenberg assisted Dakota in negotiating the Definitive Agreement. *Id.* ¶ 17.

On March 15, 1995, Western Wireless sent Dakota a final revised copy of the Definitive Agreement, and further informed Dakota that "no further negotiations with respect to the terms of this Agreement will be entertained." *Id.* ¶ 18. Dakota was given until March 17, 1995 to agree to the terms of the Definitive Agreement. *Id.* On March 17, 1995, Dakota informed Western Wireless that except for schedule completion and minor corrections, an agreement had been reached. *Id.* On May 31, 1995, the sale of the Cellular System closed. *Id.* ¶ 21. At some point around that date, but before closing, Dakota informed Falkenberg that it did not intend to pay the sales commission for Falkenberg's efforts. *Id.* ¶ 20.

On June 12, 1995, Falkenberg filed a complaint seeking recovery of its commission of the amount of $130,000, calculated pursuant to paragraph 6 of the Listing Agreement. D.I. 1. Falkenberg alleges that Dakota breached the Listing Agreement by failing to pay the commission allegedly due. *Id.* ¶¶ 22–24. Falkenberg also seeks quantum meruit recovery for $130,000, in the event that the commission is not recoverable under the contract. *Id.* ¶¶ 25–26.

Dakota filed the present Motion to Dismiss on July 7, 1995, D.I. 5, and oral argument was held on November 15, 1995. Dakota argues that recovery under the Listing Agreement should be denied because (1) the Listing Agreement had expired by its own terms and thus Falkenberg was not entitled to recovery; and (2) even assuming the Listing Agreement has not expired, Falkenberg failed to satisfy the express terms of the Listing Agreement required in order for it to be entitled to a commission. Dakota further argues that Falkenberg fails to state a claim for quantum meruit, on the grounds that (1) quantum meruit is unavailable where the contract terms expressly govern payment of a commission; and (2) Falkenberg's actions taken after the termination of the Listing

Agreement were voluntary and Falkenberg is barred from recovery.

### III. Analysis

#### A. *Choice of Law*

 In this breach of contract action, jurisdiction is based on diversity of citizenship, 28 U.S.C. § 1332. The Court must therefore apply the law of the forum state, including its choice of law provisions. *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Carrick v. Zurich–American Ins. Group,* 14 F.3d 907, 909 (3d Cir.1994); *Dubin Weston, Inc. v. Louis Capano & Sons, Inc.,* 394 F.Supp. 146, 153 (D.Del.1975). Delaware applies the "most significant relationship" approach of the Restatement of Conflict of Laws to resolve choice of law issues sounding in contract. *Travelers Indem. Co. v. Lake,* 594 A.2d 38, 41 (Del.1991). Section 188 of the Restatement advises a federal court in a breach of contract action to consider the following factors in determining the "most significant relationship:" (a) the place of contracting; (b) the place of negotiation of the contract; (c) the place of performance; (d) the location of the subject matter of the contract; and (e) the domicile, residence, nationality, place of incorporation and place of business of the parties. Restatement (Second) of Conflict of Laws § 188 (1971). The Comment notes that when the place of negotiation and place of performance are in the same state, a court should generally apply the law of that state. *Id.* cmt. f. In this case, the contract was sent to Dakota out of Falkenberg's Colorado office. Performance under the contract, i.e., Falkenberg's efforts to procure a buyer, occurred out of Falkenberg's Colorado office. Further, Falkenberg is a Colorado corporation, and also maintains its headquarters there. The Court therefore holds that Colorado law will govern.

 As with many diversity cases, some issues presented to this Court are issues which have not been addressed by Colorado's highest court. Where the state's highest court has not spoken to an issue presented, the Court must predict how the state court would resolve the issues should it be called upon to do so. *Wiley v. State Farm Fire &*

*Cas. Co.,* 995 F.2d 457, 459 (3d Cir.1993). The Court is guided by state intermediate appellate decisions, because although not dispositive, they are evidence of state law. *Robinson v. Jiffy Executive Limousine Co.,* 4 F.3d 237, 242 (3d Cir.1993) ("In the absence of a clear pronouncement from the state's highest court, a federal court may consider the decisions of the state's intermediate appellate courts.") (quoting *Burke v. Maassen,* 904 F.2d 178, 182 (3d Cir.1990); *see also Patterson v. American Bosch Corp.,* 914 F.2d 384, 391 (3d Cir.1990).

### B. *Standard For Rule 12(b)(6) Motion to Dismiss*

■ Dakota has moved to dismiss Falkenberg's complaint pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(6). The standard for deciding a Rule 12(b)(6) motion is whether under any reasonable reading of the pleadings, plaintiff may be entitled to relief. *Simon v. Cebrick,* 53 F.3d 17, 19 (3d Cir.1995). A court ruling on a Rule 12(b)(6) motion must take as true the well-pleaded facts as alleged in the plaintiff's complaint, and draw all reasonable inferences therefrom in the light most favorable to the plaintiff. *D.R. v. Middle Bucks Area Vocational Technical Sch.,* 972 F.2d 1364, 1367 (3d Cir.1992), *cert. denied,* 506 U.S. 1079, 113 S.Ct. 1045, 122 L.Ed.2d 354 (1993). Here, that means that the Court must accept as true the well-pleaded facts and reasonable inferences in Falkenberg's complaint.

■ However, it is not necessarily true that a court considering a Rule 12(b)(6) motion in the context of a contract dispute must accept as true the construction of the contract proffered by the plaintiff. This issue is determined by whether the terms of the contract are ambiguous. It is for the Court to determine whether a contract term is ambiguous or unambiguous, as this determination is itself a question of law. *Tigg Corp. v. Dow Corning Corp.,* 822 F.2d 358, 362 (3d Cir.1987); *Buckley Bros. Motors, Inc. v. Gran Prix Imports, Inc.,* 633 P.2d 1081, 1083 (Colo.1981) (en banc). An ambiguous term is defined as a term susceptible to two reason-

able alternative interpretations. *Mellon Bank, N.A. v. Aetna Business Credit, Inc.,* 619 F.2d 1001, 1011 (3d Cir.1980); *Nevets C.M., Inc. v. Nissho Iwai Am. Corp.,* 726 F.Supp. 525, 531 (D.N.J.1989), *aff'd,* 899 F.2d 1218 (1990). If a contract term is ambiguous, its intended meaning is determined as a question of fact. *Tigg,* 822 F.2d at 362; *Ram Constr. Co. v. American States Ins. Co.,* 749 F.2d 1049, 1052 (3d Cir.1984); *Pepcol Mfg. Co. v. Denver·Union Corp.,* 687 P.2d 1310, 1314 (Colo.1984) (en banc).

■ The heart of this dispute is the meaning of paragraph 5 of the Listing Agreement and whether its language is ambiguous. Paragraph 5(b) states that in order for Falkenberg to be entitled to a commission, an agreement to sell the Cellular System to an Identified Buyer must be entered into and consummation of that transaction must occur during the Protection Period. D.I. 1, Exh. A, ¶ 5. The parties disagree as to whether paragraph 5 requires consummation to occur within the Protection Period. In *Union Rural Elec. Ass'n v. Public Utils. Comm'n,* 661 P.2d 247, 251 (Colo.1983) (en banc), the Colorado Supreme Court held that "a mere disagreement between the parties as to the interpretation of an agreement does not in itself create an ambiguity as a matter of law." As discussed *infra* at Part C, the only reasonable interpretation of the provision is one which requires *both* an agreement to be reached and consummation to occur within the Protection Period. *See Radiology Professional Corp. v. Trinidad Area Health Ass'n,* 577 P.2d 748, 750 (Colo.1978) (en banc) ("In ascertaining whether certain provisions of a document are ambiguous, the instrument's language must be examined and construed in harmony with the plain and generally accepted meaning of the words employed, and reference must be made to all the provisions of the agreement.").

■ Applying Colorado law, the Court holds that paragraph 5 is not ambiguous. It is not susceptible to different but equally reasonable interpretations.[2] Falkenberg's

---

2. Even if ambiguity is found to exist, because Falkenberg was the drafter of the Listing Agreement, all ambiguity should be strictly construed against Falkenberg. *See Green Shoe Mfg. Co. v.*

legal interpretation to the effect that Dakota's obligation to pay the commission matured when agreement was reached in mid-March, see D.I. 1, ¶ 23, will not be treated as a fact which this Court must accept as true on this Motion to Dismiss. The Court is left only to determine whether under any set of facts, Falkenberg would be entitled to relief.

### C. Commission Recovery under Listing Agreement

Dakota makes several arguments to support its Motion to Dismiss. First, Dakota argues that the contract had expired by its own terms on April 16, 1995,[3] after which point Dakota had no legally binding obligation to Falkenberg. Dakota reasons that the Listing Agreement provided that Falkenberg would serve as Dakota's agent for a period of 180 days, and the six month Protection Period extended through, at the latest, April 30, 1994. Since closing did not occur until May 31, 1995, Falkenberg's claim under the Listing Agreement, which was no longer in force, must fail since Falkenberg has not abided by the requirements of its own contract. Dakota further argues that even assuming a legally binding contract after April 16, 1995, Falkenberg failed to satisfy the contract terms, in that (1) an agreement to sell the Cellular System was not entered into within the Protection Period; (2) Falkenberg failed to identify GCC License as an Identified Buyer; and (3) the consummation of the sale did not occur within the Protection Period. Falkenberg responds to these arguments by asserting that (1) an agreement was reached within the Protection Period; (2) the agreement contemplated GCC License as an Identified Buyer; and (3) the transaction was consummated within the Protection Period. The Court will address the arguments seriatim.

Dakota first argues that no agreement for the sale of the Cellular System was entered into within the required timeframe. It urges the date of execution of the Definitive Agreement was May 17, 1995, a date well beyond the expiration of the Protection Period, April 30, 1995.[4] Dakota further asserts that the December letter of intent does not constitute an "agreement," as the word is used in paragraph 5 of the Listing Agreement. Falkenberg, however, alleges a different set of facts in its complaint, facts which this Court must accept as true when ruling on a motion to dismiss under Rule 12(b)(6). See Simon, 53 F.3d at 19. Falkenberg states that a letter of intent was entered into on December 16, 1994, which set forth some of the relevant terms of the sale to Western Wireless or an affiliated entity, but that agreement was subject to the execution of the Definitive Agreement. D.I. 1, ¶ 14. Falkenberg also alleges that the final revised purchase agreement was sent on March 15, 1995 to Dakota, and on March 17, 1995, "an agreement had been reached," subject to schedule completion and minor corrections. Id. ¶ 18.[5] It is impossible to determine at this stage whether the Definitive Agreement had been reached by

---

Farber, 712 P.2d 1014 (Colo.1986); Elliot v. Joyce, 889 P.2d 43, 46 (Colo.1994) (en banc).

**3.** Dakota has requested this Court to take judicial notice that calculating one month at every four weeks (or 28 days), six months from October 30, 1994, the date the Term expired, is April 16, 1995. D.I. 6 at 4 n. 1. The Court declines the invitation, and will use the standard measure of a month as a calendar month. Therefore, the Protection Period, which commenced on October 30, 1994, ended on April 30, 1995.

**4.** The Definitive Agreement is not part of the record.

**5.** Falkenberg argues that it should be entitled to commission under the reasoning of Great Falls Properties, Inc. v. Professional Group, Ltd., 649 P.2d 1082 (Colo.1982) (en banc). There, the Colorado Supreme Court held that the word "sells," as is used in a listing agreement, does not mean that the actual transfer of title must occur during the relevant period. "We also agree with the court of appeals that minor modifications in a sales agreement between the time of expiration of the listing contract and the closing do not defeat the broker's claim for a commission based on the sale within the listing period." Id. at 1085. Extrapolating that reasoning, Falkenberg argues that the fact that minor modifications were made to the Definitive Agreement does not mean that no agreement was reached within the Protection Period. While this extrapolation may be correct, an agreement within the Protection Period is just one of the requirements which Falkenberg must satisfy before it is entitled to its commission. As discussed infra, Falkenberg must also show that consummation of the Definitive Agreement occurred within the Protection Period.

April 30, 1995, the date the Protection Period ended. Therefore, in light of Falkenberg's allegations, the Court cannot conclude that there are no set of facts under which Falkenberg would be entitled to relief. *See Simon,* 53 F.3d at 19. Accordingly, Dakota's first argument in support of dismissal must fail.

Dakota next argues that Falkenberg failed to identify GCC License as an Identified Buyer, as required by paragraph 5(b), because the Identified Buyer List referred to an entity known as "General Cellular Corp/Western Wireless." GCC License, the eventual purchaser, was not specifically listed. Therefore, Dakota reasons, Falkenberg failed to satisfy paragraph 5(b)'s requirement of identification of an Identified Buyer. Falkenberg, however, alleges in its complaint that the December letter of intent indicated that Western Wireless "or an affiliated entity" would purchase the Cellular System. D.I. 1, ¶ 14. The Court cannot conclude that as to Dakota's second argument, Falkenberg would be unable to prove any set of facts which would entitle it to relief. *See Simon,* 53 F.3d at 19. Accordingly, Dakota's argument that Falkenberg has failed to identify GCC License as an Identified Buyer must fail.

Finally, Dakota argues the consummation of the sale did not occur within the required timeframe. Dakota correctly posits that paragraph 5(b) requires an agreement with an Identified Buyer *and* consummation of the sale within the Protection Period. Since Falkenberg itself concedes that consummation did not occur until May 31, 1995, Dakota reasons, Falkenberg has not satisfied the requirements for entitlement to its commission.[6] Falkenberg argues the Listing Agreement does *not* require consummation to occur during the Protection Period. This argument states a legal conclusion rather than a factual allegation, and thus, the Court need not accept it as true for the purpose of this Motion to Dismiss.

Falkenberg has devoted substantial time and effort to convince the Court that the Listing Agreement does not require consum-

mation during the Protection Period. At oral argument, Falkenberg urged that because the word "consummated," as it appears in paragraph 5(a), is modified by the phrase "whether or not such consummation occurs during the Term," the same modifying phrase should be read to modify the word "consummated" as it appears in paragraph 5(b). In other words, Falkenberg asserts that the qualification that consummation need not occur during the Term applies with equal force to transactions covered in 5(b), irrespective of the fact that 5(b) contains no such qualifying language. Falkenberg's explanation is that defining the word a second time would cause unnecessary verbiage. Falkenberg asserts that the language underscored below would have to be omitted if the Court were to accept Dakota's interpretation, i.e., that the word "consummated" is *not* modified by the phrase "whether or not such consummation occurs during the Term."

> 5. The Company [Falkenberg] will be entitled to a commission . . . if (a) during the Term an agreement is entered into with anyone to sell the Assets or Interests and the transaction contemplated by such agreement is consummated whether or not such consummation occurs during the Term, or (b) within six months after the Term of this Agreement an agreement *is entered into* to sell the Assets or Interests to an Identified Buyer *and the transaction contemplated by such agreement* is consummated.

D.I. 7 at 13. The Court does not agree. Falkenberg's explanation that "consummation" has already been defined cannot be accepted for two reasons. First, the phrase "whether or not consummation occurs during the Term" is not a definition of "consummation," but rather, a limiting phrase. As such, there is no reason to carry the phrase over to each successive place the word appears. Clauses (a) and (b) of paragraph 5 have legal significance independent of one another. Subsection (a) covers situations where the agreement is entered into during the Term of the Listing Agreement. Subsection (b) ap-

---

**6.** Falkenberg makes no distinction between "closing" and "consummation" for the purpose of determining its right to a commission. *Com-*

*pare,* D.I. 7 at 10 (citing paragraph 21 of its complaint), *with* D.I. 1, ¶ 21.

plies to the factual scenario where the agreement is entered into during the six month Protection Period *after* the Term expires. No fair reading of paragraph 5 would support a contrary construction.

Second, and more important, the modifying phrase "whether or not consummation occurs during the Term" is nonsensical as applied in 5(b). Subsection (b) does not refer to events which occur during the Term, but rather, events which occur *after* the Term, during the Protection Period. Falkenberg would have the Court interpret subsection (b) as follows: *"Within six months after the Term of this agreement,* an agreement is entered into ... and the transaction ... is consummated, *whether or not such consummation occurs during the Term."* How subsection (b) could refer to an agreement *after* the Term but consummation potentially *during* the Term, the Court is at a loss to understand. Accordingly, Falkenberg's argument is without merit. The Court agrees with Dakota that paragraph 5(b) contains the requirement that both agreement and consummation must occur within the Protection Period in order for Falkenberg to be entitled to its commission.

■ Alternatively, Falkenberg urges the Court to give meaning to the "purpose and object" of the Listing Agreement, which was the payment of commission in exchange for efforts to procure a purchaser. Falkenberg also asks the Court to interpret the Listing Agreement in a way which is not "commercially unreasonable," in order to prevent a situation where a seller could delay closing in order to avoid paying the commission to the broker.

> If [Dakota's] argument were accepted, a seller could frustrate a broker's right to a commission by the mere expedient of delaying the closing. Because the exact timing of the closing is an event over which the seller has some control and over which the broker has none, all that is required is consummation of the transaction, not consummation within the six month Protection Period.

D.I. 7 at 13–14. The Court disagrees. Simply because a party could be treated adversely under a contract by its plain meaning does

not mean that the plain meaning should be ignored. *See Horton–Cavey Realty Co. v. Spencer,* 37 Colo.App. 96, 544 P.2d 998, 1000 (1975) (parties will be held to the plain meaning of the terms even though the results may be harsh); *see also Yamin v. Levine,* 206 P.2d 596 (Colo.1949) (courts possess no authority to rewrite contracts and must enforce unambiguous contracts in accordance with their terms), *cited in Radiology Professional Corp.,* 577 P.2d at 751. If Falkenberg had desired to protect itself from the possibility of consummation of a near-complete sale *outside* the Protection Period, as drafter of the Listing Agreement, it could have done so.

■ The facts as presented by Falkenberg state the following sequence of events. The Definitive Agreement was reached on March 17, 1995, subject to minor corrections and schedule completion. Whether this agreement was final at that date need not be determined because in any event, the Protection Period ended on April 30, 1995. Closing occurred on May 31, 1995. It is clear, therefore, that the consummation of the sale did not occur within the Protection Period. By the Listing Agreement's own terms, Falkenberg is not entitled to a commission. Therefore, the Court concludes that Falkenberg is not entitled to relief under any set of facts. *See Simon,* 53 F.3d at 19.

This result is strengthened by decisions of Colorado courts which have held that a broker's failure to meet the express requirements of his listing agreement precludes recovery of the commission. In *P.J. Berry Co. v. Denver Am. Family Lodge W., Inc.,* 663 P.2d 264 (Colo.App.1983), the court found that where the listing agreement required the broker to (1) disclose the name of the purchaser to the seller, and (2) negotiate on behalf of the seller to effectuate the sale, the broker's failure to negotiate on behalf of the seller precluded recovery of the commission. *Id.* at 265–66. Because the clause was clear and unambiguous, the parties would be held to the plain and accepted meaning of the terms although the results may be harsh. *Id.* (citing *Horton–Cavey,* 544 P.2d at 1000 (where wife of owner told broker about potential purchaser, broker was not entitled to commission after sale because broker did not

"disclose" the name of the purchaser to owner, as required by listing agreement)); *cf. Andrews v. Minissale Realty, Inc.*, 487 P.2d 603, 605 (Colo.App.1971) (failure of listing agreement to expressly provide for commission in the event of a lease during protection period precludes recovery of commission based on a lease agreement).

In *Stanford v. Ronald H. Mayer Real Estate, Inc.*, 849 P.2d 921 (Colo.App.1993), plaintiffs sought to enforce an agreement whereby the defendant, a real estate broker acting as sales agent on behalf of a seller, promised to pay a percent of its commission to plaintiffs, who were cooperating in the effort to procure a buyer. *Id.* at 922. The buyer subsequently defaulted and the sale never closed. Following default, defendant was entitled to earnest money as provided in the purchase and sale contract. Plaintiffs filed an action for their portion, on the theory that had the sale closed, plaintiffs would have been entitled to part of the commission. The court found that plaintiffs were not entitled to any portion of the earnest money compensation because the condition of a sale, which must be satisfied in order for plaintiffs to receive their commission, had not been met.

> However, a real estate broker's right to a commission in the first instance is governed by the particular terms of the agreement and the performance expected thereby. Accordingly, by the undisputed terms of the agreement here, plaintiffs were entitled to a commission or compensation only upon sale. Since no sale occurred, plaintiffs are not entitled to compensation.

*Id.* at 923 (internal citations omitted). In light of the strict adherence to listing agreement provisions that Colorado courts require, the Court holds that Falkenberg is not entitled to its commission on a contract theory because consummation did not occur during the Protection Period.

D. *Quantum Meruit Recovery*

 Falkenberg's second request for relief is for the amount of the commission under the theory of quantum meruit. Quan-

tum meruit recovery is permitted under Colorado law if the plaintiff demonstrates:

> (1) that a benefit was conferred upon an adverse party; (2) that the benefit was appreciated by the adverse party; and (3) that the benefit was accepted by the adverse party under such circumstances that it would be inequitable for it to be retained without payment of its value.

*Moore & Co. v. T–A–L–L, Inc.*, 792 P.2d 794, 800–01 (Colo.1990) (quoting *Martinez v. Continental Enters.*, 730 P.2d 308, 317 (Colo. 1986)). Falkenberg argues that a benefit was conferred upon Dakota, a benefit which Dakota appreciated and accepted with the knowledge that Falkenberg expected payment. Therefore, Falkenberg argues, relief should be granted under this theory. Dakota, on the other hand, argues that because the Listing Agreement expressly provided for the payment of a commission upon certain conditions, quantum meruit recovery is unavailable to Falkenberg. Both parties cite a variety of cases in support of their respective positions. In the absence of a ruling from the Colorado Supreme Court on an issue identical to the issue *sub judice*, the Court, guided by decisions of Colorado appellate courts, finds Dakota's position to be persuasive.[7] *See Robinson,* 4 F.3d at 242.

In *P.J. Berry*, 663 P.2d 264, the Colorado appellate court found that the broker, after being denied recovery of his commission under the contract, was also precluded from recovering under a theory of quantum meruit. *Id.* at 266. The court reasoned that where a contract expressly sets forth the requirements which must be satisfied before the broker is entitled to his commission, compliance with those provisions is the exclusive means to recover the commission. "We also disagree with the broker's claim to recover a commission on equitable grounds. If there is an express contract, unjust enrichment is not an issue and the broker's entitlement to a commission is determined by the terms of the contract." *Id.* Similarly, in *Stanford,* 849 P.2d 921, the appellate court denied quantum meruit recovery to the broker

---

7. Dakota also argues that Falkenberg's actions after the expiration of the contract were voluntary, and as such, Falkenberg is barred from

claiming quantum meruit recovery. Because the Court finds Dakota's first argument persuasive, it will not reach this issue.

whose commission was to be paid pursuant to the terms of an exclusive listing agreement, because the sale never closed. "Alternatively, plaintiffs contend they are entitled to [a] share ... under the equitable theory of unjust enrichment. However, there is an express contract here specifying that compensation is contingent upon completion of the sale. Thus, unjust enrichment is not a viable theory of recovery." *Id.* at 923.

Falkenberg argues that *P.J. Berry* has no precedential value, because of its reliance on *Mitten v. Weston,* 44 Colo.App. 274, 615 P.2d 60 (1980), a case which was criticized by the Colorado appellate court in *Denver Ventures, Inc. v. Arlington Lane Corp.,* 754 P.2d 785 (Colo.App.1988). However, *Denver Ventures* should not be broadly read to mean that *Mitten* is no longer sound law. The short answer to Falkenberg's argument is that the reasoning of *Mitten,* as relied upon in *P.J. Berry,* was expressly affirmed recently by the Colorado appellate court. *See Stanford,* 849 P.2d at 923. Falkenberg alternatively argues that the *P.J. Berry/Stanford* line of cases should be rejected, because the Colorado Supreme Court "has now remedied any confusion there may have been" by expressly ruling that the existence of an express contract does not preclude quantum meruit recovery. *See Elliott v. Joyce,* 889 P.2d 43, 45 (Colo.1994) (en banc). There, the court stated the general proposition that the existence of an express contract does not preclude quantum meruit recovery, *id.* at 45, a statement which, standing alone, is unobjectionable.

*Elliott* is not dispositive for two reasons. First, the statement was dicta, since the court ultimately relied on Colorado statutory law governing contingent fees. *Id.* at 45–46; *see* Rules Governing Contingent Fees, C.R.C.P. ch. 23.3. Second, the dispute before the en banc Colorado Supreme Court did *not* involve a brokerage commission, as is involved here. Brokerage commissions have been treated differently under Colorado law than other types of contracts, and the Court concludes that this differential treatment would be upheld by its highest court. *Compare, Denver Ventures,* 754 P.2d 785 (existence of contract does not necessarily pre-

clude quantum meruit recovery for unjust enrichment), *with P.J. Berry,* 663 P.2d 264 (brokerage agreement which expressly addresses broker's commission precludes quantum meruit recovery for the same), *and Stanford,* 849 P.2d 921 (same). Accordingly, *Elliott* does not compel a contrary result.

 In the present case, Falkenberg's receipt of commission is conditioned upon the fulfillment of the requirements set forth in paragraph 5(b) of the Listing Agreement. Since there is an express provision in the contract for commission, Falkenberg's failure to meet the conditions precludes quantum meruit recovery. The Court concludes that Falkenberg is not entitled to relief under any reasonable reading of the pleadings. *See Simon,* 53 F.3d at 19. Dakota's Motion to Dismiss under quantum meruit will be granted.

## IV. Conclusion

Dakota's Motion to Dismiss will be granted. Under both contract and quantum meruit theories, Falkenberg fails to state a claim upon which relief may be granted.

## *MEMORANDUM OPINION ON MOTION TO ALTER JUDGMENT*

### I. Introduction

Before the Court is a motion to alter judgment filed by plaintiff Falkenberg Capital Corporation ("Falkenberg"), pursuant to Federal Rule of Civil Procedure ("Rule") 59(e) (the "Motion to Alter Judgment"), of this Court's Order dated February 6, 1996 ("Order"), granting defendant Dakota Cellular, Inc.'s ("Dakota") Motion to Dismiss pursuant to Rule 12(b)(6) (the "Motion to Dismiss"). Docket Item ("D.I.") 10. For the reasons set forth below, Falkenberg's Motion to Alter Judgment will be denied.

### II. Factual and Procedural Background

Falkenberg had filed a complaint against Dakota seeking recovery of a commission allegedly due under an agreement entered into between the parties (the "Listing Agreement"), whereby Falkenberg agreed to serve as the exclusive sales agent for Dakota's cellular system. D.I. 1. The Listing Agreement provided for the payment of a

242

commission to Falkenberg upon satisfaction of certain conditions. The Listing Agreement further provided that during the six month period after the contract term expired (the "Protection Period"), Falkenberg still had a right to receive the commission if a sale was agreed to and consummated during that period. At a date after the Protection Period ended, the sale of the cellular system, facilitated by Falkenberg's efforts, closed. Falkenberg sued for its commission, arguing that it had satisfied the conditions of the Listing Agreement, and was therefore entitled to its commission. In the alternative, Falkenberg also sought recovery in quantum meruit for the amount of the commission, purporting to comprise the value of the benefit bestowed upon Dakota. *Id.* Dakota filed a Motion to Dismiss pursuant to Rule 12(b)(6). D.I. 5.

After briefing was completed, argument was held on Dakota's Motion to Dismiss on November 15, 1995. The Court, finding that Falkenberg failed to meet the express requirements of the Listing Agreement, granted Dakota's Motion to Dismiss on the contract claim. *See* D.I. 9 (Memorandum Opinion of Feb. 6, 1996). The Court also found that Falkenberg had no claim for quantum meruit recovery because under Colorado law, quantum meruit recovery is prohibited under brokerage contracts which expressly provide for the payment of commissions. Accordingly, the Court granted Dakota's Motion to Dismiss on the quantum meruit claim, as well. *See id.*

On February 21, 1996, Falkenberg timely filed a Motion to Alter Judgment pursuant to Rule 59(e). D.I. 12. Falkenberg argues the Court should alter its judgment to deny Dakota's Motion to Dismiss first on the ground that under Colorado law, evidence of indus-

try custom and usage is admissible to aid in the interpretation of contract provisions, even if the provisions are not ambiguous. In support of this argument, Falkenberg submitted an affidavit of its Senior Vice President Ray Hernandez ("Hernandez"), who has been involved in the telecommunications industry for eleven years and has negotiated listing agreements for sales of cellular systems for six years. D.I. 11. According to the affidavit, industry custom and usage provides that a broker is entitled to recover a commission for a sale which is agreed to within the protection period but which is not closed until after the protection period expires, due in large part to the vagaries of the approval process at the Federal Communications Commission. *Id.* ¶ 3. Hernandez further states that because Falkenberg provided "extensive" services to Dakota after the term of the contract expired, recovery of its commission is appropriate. *Id.* ¶¶ 4, 5. Falkenberg also argues that its claim for quantum meruit is valid because the benefit conferred upon Dakota occurred after the contract term and Protection Period ended. Therefore, Falkenberg reasons, recovery is *not* governed by the contract terms, and the Court's prior rationale is inapposite.[1]

Dakota responds to Falkenberg's contentions by arguing that Falkenberg has not met the standards required for a motion to alter judgment, but even assuming that it had, Falkenberg's interpretation of Colorado law with respect to contract law is erroneous. D.I. 15. Dakota further argues that with respect to the quantum meruit claim, Falkenberg does not demonstrate clear legal error in the Court's Order, but rather merely disagrees with the Court's rationale. Thus, Dakota reasons, Falkenberg has failed to dem-

---

1. Falkenberg's quantum meruit argument is presented in a slightly different form at this stage that it originally appeared in opposition to Dakota's Motion to Dismiss. Initially, Falkenberg took that position that quantum meruit is recoverable where, as here, a benefit is conferred upon a party, which that party appreciates, and the benefit was accepted by that party in circumstances in which it would be inequitable for it to be retained without payment of its value. D.I. 7 at 16. At this stage, however, Falkenberg argues that while it may not have performed all of its

brokerage services resulting in the consummated sale during the contract term and Protection Period, it took steps *after* the Protection Period, *at Dakota's request*, to facilitate the consummation of the sale. *See* D.I. 13 at 8–9. These services, Falkenberg reasons, merit quantum meruit recovery. Whatever the current theory, the Court nonetheless concludes, as discussed *infra*, that the post-judgment Rule 59(e) procedure is not the proper mechanism to advance new arguments.

onstrate that it is entitled to reconsideration. *See id.*

### III. Analysis

 A motion to alter judgment "must rely on one of three major grounds: '(1) an intervening change in controlling law; (2) the availability of new evidence [not available previously]; [or] (3) the need to prevent clear error [of law] or prevent manifest injustice.'" *North River Ins. Co. v. CIGNA Reins. Co.*, 52 F.3d 1194, 1218 (3d Cir.1995) (quoting *Natural Resources Defense Council v. United States Envtl. Protection Agency*, 705 F.Supp. 698, 702 (D.D.C.1989) (further citations omitted). A Rule 59(e) motion is not designed to permit a party to raise new issues previously available but not raised prior to entry of judgment. Courts take a "dim view of issues raised for the first time in post-judgment motions." *Kiewit E. Co. v. L & R Constr. Co.*, 44 F.3d 1194, 1204 (3d Cir.1995). Nor are Rule 59(e) motions designed to allow a party to present additional evidence as a basis for relief. *United States v. Accounts Nos. 3034504504 and 144–07143*, 971 F.2d 974, 987 (3d Cir.1992).

In the case *sub judice*, Falkenberg fails to explain which of the three proper grounds it relies upon for this motion. There has been no intervening change in controlling law since the date the Order was entered, *see North River*, 52 F.3d at 1218, nor does Falkenberg allege as much. Further, no new evidence which was previously unavailable has been identified. Instead, Falkenberg submits the affidavit of Hernandez, an officer whose responsibilities include the actual negotiation and drafting of such listing agreements, to the effect that certain industry custom and usage was implicit and incorporated into the wording of the Listing Agreement. D.I. 11. It cannot seriously be contended that an actual drafter of listing agreements who is familiar with *established* industry practice and attests to such industry practice is now setting forth "new evidence [not available previously]." *See North River*, 52 F.3d at 1218.

 Finally, Falkenberg has not demonstrated a clear error of law or the need to prevent manifest injustice. *See id.* Falkenberg instead disagrees with this Court's reli-ance on certain controlling Colorado cases, and the breadth and scope of other cases which have been rejected by the Court. *See, e.g.*, D.I. 13 at 9 ("The cases of *P.J. Berry Co. v. Denver Am. Family Lodge W., Inc.*, 663 P.2d 264 (Colo.App.1983) and *Stanford v. Ronald H. Mayer Real Estate, Inc.*, 849 P.2d 921 (Colo.App.1993), which the Court relied upon in dismissing Falkenberg's quantum meruit claim, are unlike the present case and are not controlling."). That Falkenberg does not agree with the Court that the scope of the above cited cases reaches the dispute *sub judice* is *not* an assertion of clear legal error which would warrant grant of its motion. Further, the Court does not agree that failure to alter its judgment would cause manifest injustice. As noted earlier, "[i]f Falkenberg had desired to protect itself from the possibility of consummation of a near-complete sale *outside* the Protection Period, as drafter of the Listing Agreement, it could have done so." D.I. 9 at 14.

The Third Circuit Court of Appeals has expressly held that Rule 59(e) motions are not designed to provide a mechanism to raise new issues previously available but not raised before, *see Kiewit*, 44 F.3d at 1204, nor to allow a party to present additional evidence as a basis for relief, *see United States v. Accounts Nos. 3034504504 and 144–07143*, 971 F.2d at 987, yet that is precisely what Falkenberg has done.

 Falkenberg states that "[b]ecause the matter arose on a Rule 12(b)(6) motion prior to discovery, the Court, in reaching its conclusions, did not have before it evidence of the cellular telephone industry's custom and usage...." D.I. 13 at 1. While this assertion is true, Rule 12(b)(6) expressly provides a mechanism for consideration of matters outside the pleadings. Falkenberg, represented by competent counsel, chose to rely on its complaint and failed to proffer all its evidence at the Rule 12(b)(6) stage. Now that it has lost, it cannot try to raise new issues for the first time at its post-judgment motion. That tactic is not a proper use of Rule 59(e), and accordingly, Falkenberg's Motion to Alter Judgment will be denied.

244

## IV. Conclusion

Falkenberg has failed to demonstrate a proper justification for this Court to reconsider its earlier ruling. Accordingly, Falkenberg's Motion to Alter Judgment will be denied.