23CA1151 La Plata Open v Baker 01-23-2025

COLORADO COURT OF APPEALS

---

Court of Appeals No. 23CA1151
La Plata County District Court No. 19CV30107
Honorable Suzanne F. Carlson, Judge

---

La Plata Open Space Conservancy, a Colorado non-profit corporation,

Plaintiff-Appellee and Cross-Appellant,

v.

Harry Baker and Paulette Baker,

Defendants-Appellants and Cross-Appellees.

---

JUDGMENT AFFIRMED IN PART AND REVERSED IN PART,
AND CASE REMANDED WITH DIRECTIONS

Division V
Opinion by JUDGE LUM
Harris and Brown, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced January 23, 2025

---

Karp Neu Hanlon, P.C., James F. Fosnaught, Shoshana Rosenthal, Glenwood
Springs, Colorado, for Plaintiff-Appellee and Cross-Appellant

Lewis Roca Rothgerber Christie LLP, Kendra N. Beckwith, Denver, Colorado;
Golden & Landeryou, LLC, Kenneth S. Golden, Durango, Colorado, for
Defendants-Appellants and Cross-Appellees

¶ 1    Defendants, Harry Baker and Paulette Baker (collectively, the Bakers), appeal the district court's judgment entered in favor of plaintiff, La Plata Open Space Conservancy (La Plata). La Plata cross-appeals the district court's denial of its post-trial motion requesting additional relief. We affirm in part, reverse in part, and remand for further proceedings.

## I.    Background

¶ 2    In 1994, La Plata obtained a conservation easement on an eighty-acre Durango property from the property's original owners (Original Easement). In 2003, La Plata and the original owners entered into a "Restated and Amended Deed of Conservation" (Amended Easement).

¶ 3    The Amended Easement's primary purposes are to protect and enhance the property's existing wildlife habitat; preserve the property in its "natural, ecological, open space and agricultural condition"; and prevent any uses that impair the property's conservation values. To fulfill its intended purposes, the Amended Easement lists in detail the permitted and prohibited uses of the property and establishes guidelines for where and how permitted uses can occur. The Amended Easement also permits La Plata to

1

periodically inspect the property; if La Plata finds a violation that caused an injury, it can require the property owner to "restore the portion of the property so injured to its prior condition."

¶ 4    In 2006, the original owners sold the property to Peter Johnston and Maren Moebius (collectively, Johnston), who, in turn, sold the property to the Bakers in 2013. Between 2015 and 2019, La Plata issued three violation notices relating, as relevant here, to (1) a replacement barn built on the property; (2) agricultural operations occurring outside of a designated agricultural area; (3) conversion of a trail on the south side of the property into a widened, graveled road (south road); (4) fencing on the northern and southern ends of the property; and (5) the continued growth of noxious weeds.

¶ 5    In 2019, La Plata sued the Bakers to enforce the Amended Easement, asserting five claims for relief: (1) breach of contract; (2) "damages for interference and violation of conservation easement" pursuant to § 38-30.5-108(3), C.R.S. 2024; (3) declaratory relief; (4) injunctive relief; and (5) continuing trespass upon the Amended Easement.

¶ 6    After a four-day trial and a site visit, the district court issued an order (the Order) concluding that the Bakers did not violate the Amended Easement by constructing the barn but did violate the Amended Easement by (1) conducting agricultural activities outside the designated agricultural area; (2) creating and widening the south road; (3) installing a gate on the south road; and (4) constructing fences that did not "meet wildlife-friendly guidelines prescribed by the Colorado Division of Wildlife." The court further found that these violations "impaired the conservation values of the property." The district court did not make an express finding that the Bakers violated the Amended Easement by permitting noxious weed growth.

¶ 7    The court entered injunctive relief, ordering the Bakers to take specific measures to remediate the violations and to refrain from conducting certain activities. The court relied on the recommendations of La Plata's expert witness as a "blueprint for the restoration ordered." The Bakers were required to pay for the cost of the restoration. Despite not finding a weed-related violation, the court also ordered the Bakers to take action with respect to the weeds. Finally, the court determined that La Plata was the

3

prevailing party and awarded it reasonable attorney fees and costs under the Amended Easement's fee-shifting provision.

¶ 8 La Plata moved to amend the Order, asserting that it lacked sufficient detail necessary to enforce the injunctive relief. The Bakers also moved to amend the Order, asserting that the court erred by awarding La Plata its attorney fees. Both post-trial motions were deemed denied when the court did not resolve them within sixty-three days. *See* C.R.C.P. 59(j).

¶ 9 On appeal, the Bakers contend that the district court erred by (1) concluding that the agricultural area, south road, gate, and fencing violated the Amended Easement; (2) ordering injunctive relief related to each of those violations that was overly broad or otherwise inconsistent with the Amended Easement; (3) ordering injunctive relief related to the presence of weeds when the court did not find that the weeds violated the Amended Easement; and (4) concluding that La Plata was the prevailing party and awarding it attorney fees and costs. La Plata's cross-appeal contends that the district court erred by denying its post-trial motion. Both parties contend that the fee-shifting provision entitles them to attorney fees and costs incurred in this appeal.

¶ 10    First, we address each violation and its corresponding injunctive relief.  Second, we address the injunctive relief ordered for the weeds.  Third, we address whether the injunctive relief was sufficiently detailed.  Finally, we address the court's award of attorney fees and costs and the parties' requests for appellate fees and costs.

## II.    Generally Applicable Law and Standards of Review

### A.    Creation and Interpretation of Conservation Easements

¶ 11    Colorado's Conservation Easement Act (the Act) establishes the purposes of and requirements for conservation easements. §§ 38-30.5-101 to -111, C.R.S. 2024.  A conservation easement "is a permanent restriction that runs with the land for the purpose of protecting and preserving the land."  *Markus v. Brohl*, 2014 COA 146, ¶ 1 (quoting *Kowalchik v. Brohl*, 2012 COA 25, ¶ 2); *see* §§ 38-30.5-102, -103(1)-(3), C.R.S. 2024.

¶ 12    "The extent of an expressly created easement (i.e., the limits of the privileges of use authorized by the easement) is determined by interpreting the conveyance instrument," which we do according to ordinary principles of contract interpretation.  *Lazy Dog Ranch v. Telluray Ranch Corp.*, 965 P.2d 1229, 1235-36 (Colo. 1998).  Our

paramount concern is to determine and give effect to the intentions of the parties who created the instrument. *Id.* at 1235. We ascertain the parties' intent from the instrument's plain language, giving words and phrases their generally accepted meanings. *Gagne v. Gagne*, 2014 COA 127, ¶ 51.

¶ 13    "'While the interpretation of a written contract is a question of law to be determined by the court, whether there has been a breach of contract is a question of fact' to be determined by the fact finder." *Ute Water Conservancy Dist. v. Fontanari*, 2022 COA 125M, ¶ 35 (quoting *State Farm Mut. Auto. Ins. Co. v. Goddard*, 2021 COA 15, ¶ 28). "We review the [district] court's factual findings under a clear error standard, but review its legal conclusions de novo." *Id.* (quoting *Kroesen v. Shenandoah Homeowners Ass'n*, 2020 COA 31, ¶ 55).

## B.    Injunctive Relief

¶ 14    The remedy of an injunction is generally "prohibitory," meaning that it "seeks to restrain the continuance of a wrongful act or the causing of some threatened or anticipated injury." 42 Am. Jur. 2d *Injunctions* § 5, Westlaw (database updated Oct. 2024). A prohibitory injunction "afford[s] relief against future, rather than

6

past, acts." *Bd. of Cnty. Comm'rs v. Pfeifer*, 546 P.2d 946, 949 (Colo. 1976). In contrast, a mandatory injunction "commands the subject of the order to perform an affirmative act to undo a wrongful act or injury." 43A C.J.S. *Injunctions* § 19, Westlaw (database updated Dec. 2024). Injunctive relief based on breach of contract must be coextensive with the terms of the contract. *Phx. Cap., Inc. v. Dowell*, 176 P.3d 835, 843 (Colo. App. 2007); *Fulton Irrigating Ditch Co. v. Twombly*, 42 P. 253, 253 (Colo. App. 1895).

¶ 15 An injunction is an equitable remedy, and "[t]rial courts are vested with broad discretion to formulate the terms of injunctive relief." *Rinker v. Colina-Lee*, 2019 COA 45, ¶ 80. A district court abuses its discretion if its decision is manifestly arbitrary, unreasonable, or unfair or if it misconstrues or misapplies the law. *Freedom Colo. Info., Inc. v. El Paso Cnty. Sheriff's Dept.*, 196 P.3d 892, 899 (Colo. 2008).

### III. Agricultural Area

#### A. Additional Facts

¶ 16 The Amended Easement reflects an existing "agricultural area" located in the northwest corner of the property and prohibits the Bakers from growing agricultural crops or grazing livestock outside

7

of that area.  Paragraph 10 of the Amended Easement provides that the parties are free to enter into amendments, provided the amendments are "consistent with the purpose of this [Amended] Easement."  Paragraph 10 further provides that "[a]ny such amendment shall be recorded in the official records of La Plata County, Colorado."  Paragraph 16.4 reaffirms that "[n]o alteration or variation of this instrument shall be valid or binding unless contained in an amendment that complies with paragraph 10."

¶ 17    Evidence at trial showed that, sometime between 2005 and 2011 — prior to the Bakers' ownership — an 8.2-acre area south and east of the original agricultural area was irrigated and used for growing hay (relocated agricultural area).  The locations of the original and relocated agricultural areas are shown in the figure below, labeled as the "Original Designated Agricultural Area" and the "Newly-created Hay Production Area," respectively.



¶ 18    The evidence also reflected that, between 2008 and 2013, La Plata conducted annual inspections of the property each year. Monitoring reports during that timeframe indicated that the "terms of [the Amended] [E]asement [were] being observed" and that there were no "possible violations of [the] terms of the [Amended] [E]asement at this time." Scott Perez, La Plata's executive director from 2010 to 2013, testified that he first saw the property during Johnston's ownership, when Johnston was planning to list it for sale. When Perez went to the property, he observed the relocated agricultural area but didn't inform the listing agent about any

9

violations. When asked why he didn't provide information about any violations, he said, "If you read through all of the monitoring reports and board minutes . . . every time it said is there a violation, it said no."

¶ 19    Shortly after the Bakers bought the property, Mr. Baker spoke with Perez about hay growing activities. Mr. Baker testified that he and Perez looked out toward the relocated agricultural area while they spoke. According to Mr. Baker, Perez did not indicate that growing hay in that area violated the Amended Easement; instead, Perez remarked that "it was the perfect place to grow hay." The Bakers continued to conduct agricultural activities in the relocated agricultural area. They also grazed livestock outside the original and relocated agricultural areas.

¶ 20    In 2015, a conflict arose between the Bakers and La Plata relating to the Bakers' construction of a replacement barn. In June 2015, about two years after the Bakers purchased the property, La Plata issued a violation notice concerning the barn. The 2015 notice didn't mention the relocated agricultural area. Over a year later, La Plata issued a second notice that alleged twelve easement violations, including — for the first time — the relocated

agricultural area. From that point on, all notices of violation included the relocated agricultural area.

## B.    Violation

¶ 21    The Bakers contend that the district court erred by concluding that their agricultural activities in the "relocated" area violated the Amended Easement. They argue, as they did below, that the Amended Easement's terms regarding the location of the agricultural area had been modified by Johnston's and La Plata's conduct prior to the time the Bakers purchased the property. We disagree.

### 1.    Legal Principles Regarding Contract Modification

¶ 22    Colorado law permits a written contract to be modified by the parties' course of performance. *Woods v. Monticello Dev. Co.*, 656 P.2d 1324, 1327 (Colo. App. 1982). "Modification of a written agreement must be demonstrated by clear and satisfactory evidence" and requires "[t]he same meeting of the minds . . . as was necessary to make the contract in the first instance." *Grizzly Bar, Inc. v. Hartman*, 454 P.2d 788, 791 (Colo. 1969).

¶ 23    When a contract contains an anti-waiver clause or a provision that contractual modifications must be made in writing, those

11

provisions can themselves be modified or waived by conduct. *Woods*, 656 P.2d at 1327; *see also Williams v. Colo. Springs Coll. of Bus., Inc.*, 736 P.2d 419, 420 (Colo. App. 1987); *Cordillera Corp. v. Heard*, 592 P.2d 12, 14 (Colo. App. 1978), *aff'd*, 612 P.2d 92 (Colo. 1980). However, for a parties' conduct to modify or waive an anti-waiver clause or written modification requirement, it must be "so pervasive that in the eyes of a reasonable [person] it 'spoke louder than [the] word' . . . of the 'anti-waiver' clause, which in effect counseled against reliance on conduct indulging default." *Woods*, 656 P.2d at 1327 (quoting *Westinghouse Credit Corp. v. Shelton*, 645 F.2d 869, 874 (10th Cir. 1981)).

¶ 24 The party asserting that a contract provision has been modified or waived bears the burden of proof. *Schulze v. Shea*, 86 P. 117, 118 (Colo. 1906) (modification); *Bd. of Cnty. Comm'rs v. City & Cnty. of Denver*, 2022 COA 30, ¶ 28 (waiver), *rev'd on other grounds*, 2024 CO 5. Whether a contract has been modified (or whether a provision has been waived) is ordinarily a question of fact for the district court. *Fair v. Red Lion Inn*, 920 P.2d 820, 825 (Colo. App. 1995) (modification), *aff'd*, 943 P.2d 431 (Colo. 1997); *Cordillera Corp.*, 592 P.2d at 13 (waiver). But where the facts are

12

undisputed, the issue becomes a matter of law, and we are not bound by the district court's finding. *Cordillera Corp.*, 592 P.2d at 13-14; *see also Frank C. Klein & Co. v. Colo. Comp. Ins. Auth.*, 859 P.2d 323, 328 (Colo. App. 1993).

## 2. Analysis

¶ 25     In support of their argument that the Amended Easement was modified, the Bakers point to the following evidence:

- Johnston's relocation of the agricultural area;

- the annual monitoring reports from 2008-2012, each finding no violation of the Amended Easement's conditions;

- Perez's failure to inform Johnston's realtor of any violations when the realtor contacted him about the property;

- a sales brochure prepared by Johnston's real estate agent purportedly showing the relocated fields;

- the 2013 monitoring report, completed shortly after the Bakers acquired the property, again finding no violations of the Amended Easement's conditions; and

- Perez's statements to Mr. Baker indicating that the relocated area was an appropriate place to grow hay.

13

¶ 26    We assume, without deciding, that Johnston's conduct in irrigating and growing hay in the relocated area is sufficient to manifest his intent to change the terms of the Amended Easement. The primary question is whether La Plata's conduct demonstrates a "meeting of the minds" as to the relocation *and* a clear intent to waive the recording requirement for amendments. Though it's a somewhat close call, we conclude the answer is "no."

¶ 27    The 2008 monitoring report contains no evidence of the relocated agricultural area, so a person viewing that report would have no reason to believe that the inspector observed any agricultural activity outside the originally designated area.

¶ 28    The 2009 through 2012 reports provide some evidence of modification. The 2009 report explicitly notes that Johnston "installed" a side-roller irrigation system and "seeded" pastures. All four reports contain photos of the irrigation system, and the 2009 report contains photos of irrigation taking place. The reports each include a map with a dot indicating the position from which the photos were taken. Though somewhat difficult to decipher (often, several photos were taken from different directions in the same location), it appears that the 2009 report shows irrigation being

conducted toward middle-north end of the relocated area, the 2010 report shows irrigation equipment in the far north and middle-south of the area, the 2011 report shows irrigation equipment in the far south of the area, and the 2012 report shows irrigation equipment in the far north of the area — approximately in the same location as the 2010 report.[1]

¶ 29     All in all, these reports demonstrate that, on four occasions, the inspector who monitored the property saw irrigation equipment (and, on one of those occasions, irrigation activity) somewhere within the relocated agricultural area and nevertheless reported there were "no violations" of the terms of the Amended Easement. But, as described above, the photographs of the irrigation equipment were taken at different times and from different vantage points, and they don't always depict the same parts of the relocated area.  It's unclear whether the inspector saw consistent agricultural

---

[1] We agree with the Bakers that whether they reviewed the 2008-2012 monitoring reports isn't relevant to the analysis of whether La Plata and Johnston modified the Amended Easement through their conduct before the Bakers purchased the property.

activity in any single part of the relocated agricultural area, much less consistent agricultural activity throughout the whole area.[2]

¶ 30     Furthermore, a former La Plata executive director testified that the monitoring report form was later revised to remove the question about whether any violations were present because "determin[ation] of a violation is not the role solely of whoever is conducting the monitoring site visit." Thus, from this record, we can't say that the reports demonstrate that La Plata and Johnston had a "meeting of the minds" to modify the Amended Easement to relocate the agricultural area to its present location.

¶ 31     We also reject the Bakers' reliance on the real estate brochure. They point to no evidence (and we can find none) that La Plata contributed to, or even saw, the brochure. Likewise, we are unpersuaded by Perez's failure to inform Johnston's realtor about any violations. Perez explained that he didn't tell the realtor about any violations because the monitoring reports didn't reflect any. Because the monitoring reports don't demonstrate a meeting of the minds, Perez's conduct — based entirely on the reports — doesn't

---

[2] The inspector who conducted the 2009-2013 reports didn't testify.

either. And because the Bakers argue that the Amended Easement had already been modified when they purchased the property, we reject their reliance on any conduct that occurred after their purchase.

¶ 32 In any event, nothing about La Plata's conduct demonstrates that it intended to waive the recording requirement. The four reports and Perez's omission simply do not constitute the type of pervasive conduct that would "sp[eak] louder" than the recording requirement in the mind of a reasonable person. *Woods*, 656 P.2d at 1327 (quoting *Westinghouse*, 645 F.2d at 874). While La Plata's conduct might spur a reasonable person to perform additional due diligence related to any agricultural activity observed in the relocated area, it is insufficient to overcome the two provisions in the Amended Easement requiring that modifications must be recorded.

¶ 33 We agree with the district court that this conduct contrasts with La Plata's conduct concerning the modification of the Amended Easement's designated building envelope, which the court found constituted both a modification of the envelope and a waiver of the recording requirement. In that instance, La Plata had (1) responded

17

to the original owners' request for clarification for a potential buyer in a written letter saying, "It is not necessary to further amend the [Amended Easement] to allow for reconfiguration of the building area as proposed"; (2) indicated in the letter that La Plata would approve the proposed reconfiguration; (3) sent an email during the Bakers' ownership saying that the Bakers' new barn was "within the [building envelope] . . . approved by Scott [Perez]"; and (4) approved the building envelope modification at a board meeting.

¶ 34    La Plata's conduct was also different than the conduct in the caselaw cited by the Bakers that was determined to constitute a valid waiver of contractual provisions.  In those cases, the conduct (1) was closely related to the waived provision; (2) was more pervasive than that here; or (3) constituted an unambiguous (often express) offer and acceptance to proceed with a different course of action than that mandated by the written contract.  *See, e.g., id.* at 1326-27 (repeated, frequent acceptance of late payments waived seller's right to insist on timely payment); *Cordillera Corp.,* 612 P.2d at 93-94 (holding the filing of a complaint by plaintiff, filing of an answer by defendant, and filing of multiple other pleadings and motions by both parties over the course of a year was sufficient to

waive an arbitration clause); *Hahl v. Langfur Constr. Corp.*, 529 P.2d 1369, 1370-71 (Colo. App. 1974) (provision requiring extras be in writing deemed waived when subcontractor and general contractor orally agreed subcontractor would perform extras, general contractor represented that he would seek additional funds to pay for the extras, and subcontractor performed the extras).

¶ 35    For these reasons, we conclude that the district court didn't err by determining that the Amended Easement had not been further modified as the Bakers claim.[3]

## C.    Injunctive Relief

¶ 36    Because there was no modification of the Amended Easement, the district court didn't err by prohibiting the Bakers from conducting agricultural activity in the relocated area. Even so, the Bakers contend that the mandatory injunctive relief — specifically, the order that they restore the relocated agricultural area "to its original condition" — is overly broad. We conclude more findings are necessary to resolve this contention.

---

[3] In light of this disposition, we need not address La Plata's contention that conservation easements should not be modifiable by conduct at all.

¶ 37 Paragraph 2(c) of the Amended Easement entitles La Plata to "prevent any activity" that is "inconsistent with the purpose of the [Amended] Easement" and "to require restoration of such areas or features of the property *that may be damaged by any inconsistent activity or use.*" (Emphasis added.) Paragraph 6.1 provides that, if La Plata determines that an easement violation has occurred, La Plata must give the Bakers written notice of the violation and demand corrective action. If "the violation involves *injury to the property resulting from any use or activity inconsistent with the purpose of the easement*," La Plata may demand action "to restore the portion of the Property so injured to its prior condition." (Emphasis added). Finally, Paragraph 6.2 provides that, if the Bakers fail to cure the violation, La Plata may file suit to enjoin the violation and to "require the restoration of the Property to the condition that existed prior to any such injury."

¶ 38 The Amended Easement language recognizes that "injury to the property" is distinct from "activity inconsistent with the easement" and that not all inconsistent activity will necessarily result in injury to the property. In addition, restoration (1) can only be required if the "inconsistent activity" caused "damage" or "injury

20

to the property"[4] and (2) can only be ordered to the extent necessary to return the property to "the condition that existed prior to any such injury" (its preinjury condition). In other words, restoration can only be required to cure the injuries that have been caused by the inconsistent activity.

¶ 39    Here, the district court made a generalized finding that the Bakers' actions had "impaired the scenic, aesthetic, and environmental values of the easement," but it didn't make any specific findings about the preinjury condition of the relocated area or what injuries, if any, the inconsistent activity caused. Without this information, we can't discern whether the relief it ordered — restoration of the relocated agricultural area to "its original condition" — is overbroad.

¶ 40    First, because the order doesn't contain findings about the nature and extent of the injuries caused by the inconsistent agricultural activity, we can't discern whether the relief the court ordered was necessary to cure them. The court appears to have

---

[4] In contrast, activity inconsistent with the Amended Easement can be prohibited regardless of whether it has caused injury to the property. The district court's prohibition against continued agricultural activity in the relocated area falls into this category.

equated the "inconsistent activity" with the "injury" but as we've explained, not all inconsistent activity necessarily causes injury to the property.

¶ 41 Second, the condition of the relocated agricultural area at the time the easement was originally granted may be different than its condition immediately prior to the start of the injury-causing conduct. For example, changes in annual rainfall might cause changes in the type and health of vegetation in a given area over time. If the injury-causing conduct started after natural changes took place, the area's preinjury condition would be different than its "original condition." Because we lack findings about whether the relocated area's "original condition" was the same as its condition immediately before the inconsistent activity began, we can't tell whether the order goes too far. *See Phx. Cap.*, 176 P.3d at 843 (noting that injunctive relief based on a contract must be coextensive with the terms of the contract). We therefore reverse the court's restoration order as to the relocated agricultural area and remand for additional findings. *See Mulberry Frontage Metro. Dist. v. Sunstate Equip. Co.*, 2023 COA 66, ¶ 44 ("In the absence of sufficient findings, we must reverse and remand the matter for the

22

[district] court to explain the basis for its decision." (citing *Munoz v. Measner*, 247 P.3d 1031, 1034-35 (Colo. 2011))).

¶ 42   On remand, after making findings regarding the nature and extent of the injury to the relocated area and the condition of that area prior to the injury, the court must reevaluate its order requiring restoration in light of those findings. And because mandatory injunctive relief is equitable in nature, the court must also consider the parties' "relative hardships," the nature of both parties' conduct, and any other factor it deems appropriate to achieve an equitable result. *Graham v. Jules Inv., Inc.*, 2014 COA 136, ¶¶ 32, 34-35 (noting that courts must consider whether encroachment in a continuing trespass case was deliberate or occurred in good faith, along with hardships and equities of the parties, in ordering mandatory injunctive relief); *see also Bjork v. Draper*, 936 N.E.2d 763, 770 (Ill. App. Ct. 2010) (affirming the district court's consideration of the hardship to the property owner, the benefit to the party seeking to enforce the easement, the character of the enforcer's actions, the effect of the enforcer's conduct on the easement's purpose, and the actions of the easement holder before ordering the property owner to remove a

home addition that violated a conservation easement); *Lawson Prods., Inc. v. Avnet, Inc.*, 782 F.2d 1429, 1435 (7th Cir. 1986) ("[T]he equitable personality of injunctive relief requires the result to be a 'just' or 'fair' result rather than a 'correct' result.").

## IV.   South Road

¶ 43    The Bakers contend that the district court erred by concluding that their construction of the south road violated the Amended Easement and by ordering injunctive relief related to the road that was overbroad.  We agree in part.

### A.   Additional Facts

¶ 44    The Amended Easement prohibits "[t]he placement or construction of any buildings, structures, or improvements of any kind (including without limitation . . . roads . . .) other than those which are expressly permitted in paragraph 4."  Paragraph 4 doesn't expressly permit the creation of any roads or the conversion or expansion of existing trails or walkways into roads.

¶ 45    In one violation notice and demand for corrective action issued to the Bakers, La Plata wrote that the "[c]onversion of the existing trail into widened, graveled motorized roadway, and removal of mature woody vegetation, along the edge of the woodlands on the

south end" of the property violated the Amended Easement.  In connection with that violation notice, La Plata indicated the basis of the violation was that the "dirt trail/road bed . . . has been widened and graveled to accommodate motorized traffic."  La Plata specified that the Bakers' actions eliminated nesting habitats, created obstacles for smaller animals, and would likely cause other disruptions to various smaller animals.  In 2019, La Plata issued another violation notice that alleged the use of the south road "appears to have intensified, and the road appears to have been further improved, likely to allow . . . apparently more intensive use," and "the increased width of the 'roadway' suggests . . . that the recent improvement was intended to accommodate some objectively, highly impactful form of motorized use."

¶ 46      At trial, La Plata's expert, Barry Rhea, testified that when the easement was originally created, the south road had been a "narrow trail."  Using aerial photographs, he also testified that in 2013 (the year the Bakers purchased the property), the trail was "essentially the same" as it had been at the time of the original conveyance.  He opined that the trail had been about six feet wide and "was probably heavily vegetated [and] . . . may have accommodated an

ATV" before the "new road construction" occurred. Amy Schwartzbach, La Plata's former executive director, testified that, prior to the road being graveled, it existed as a "two-track," which had vegetation on the travel surface that provided habitat for wildlife. Rhea testified that the trail had been converted into "a gravel road that was about 11 to 12 feet wide on its driving surface and probably 12 to 14 feet wide in terms of the disturbance corridor that it created in its building." Rhea also testified that the roadbed was "heavily compacted" as a result of vehicles moving on the road.

¶ 47 At the conclusion of the trial, the district court found that the south road violated the Amended Easement. The court ordered the Bakers to (1) remove any gravel to allow grasses to reestablish; (2) "narrow the travel surface back to approximately six feet"; (3) rip and disk any road compaction; (4) plant grass seed mix; and (5) limit motorized vehicle use along the travel way.

## B. Violation

¶ 48 On appeal, the Bakers contend that the south road existed when they purchased the property and that all they did was gravel the surface. Because they removed the gravel before trial, they

26

contend that the road didn't violate the Amended Easement when the district court entered its order. We aren't persuaded.

¶ 49    First, the district court found that the Bakers "created a graveled road" out of what was previously a six-foot wide, two-track trail. This finding is supported by Rhea's and Schwartzbach's testimony described above. To the extent the Bakers point to conflicting evidence — namely, Mr. Baker's testimony that the trail was already a "road" when the Bakers purchased the property — it is the district court's sole province to resolve such evidentiary conflicts.

¶ 50    Second, the district court found that the expansion of the trail to create the road "was done in a manner that . . . destroys wildlife habitat and [is] to the diminishment and detriment of the conservation values of the [p]roperty." Thus, the court found an injury (the destruction of wildlife habitat) that requires restoration. This finding, too, is supported by the record. Rhea opined that "roads can have a variety of impacts on wildlife," including that animals might avoid crossing roads because of the absence of "security cover." And Schwartzbach testified that the gravel "roadbase" removed the vegetation that had previously existed in

the middle of the trail, resulting in a "big, wide gap" that "remove[d] all safe haven for animals to move across the property for nesting, for foraging."

¶ 51     Because the evidence supports the district court's findings, we affirm its ruling that the Bakers breached the Amended Easement when they converted the existing trail into the widened, graveled road.

## C.     Injunctive Relief

¶ 52     Next, the Bakers contend that the district court can only require them to restore the road to its pre-expansion condition, which they say they have already done by removing the gravel. Like their arguments relating to the violation, however, this contention assumes that the only action the Bakers took was laying gravel and that gravelling the roadway had no lasting, injurious impacts once the gravel was removed. As explained above, the evidence demonstrates that (1) the Bakers created a widened road where there had previously been only a six-foot-wide trail; (2) the gravelling removed vegetation from the travel surface; and (3) both of these impacts caused injury because of their detrimental effect on wildlife movement and habitat.

¶ 53    For these reasons, we conclude that most of the injunctive relief contained in the Order — removal of remaining gravel; narrowing of the travel surface back to approximately six feet; ripping and disking road compaction[5]; and planting a grass seed mix — are necessary to return the road and surrounding area it to its preinjury condition (a six-foot-wide, two-track trail). Accordingly, such relief is permitted by paragraph 6.2 of the Amended Easement.

¶ 54    However, we agree with the Bakers that the district court erred by limiting their use of motorized vehicles to "that necessary to carry out the rehabilitation of the road" and then to "occasional ATV use for the purpose of weed spraying."

¶ 55    Paragraph 3(l) of the Amended Easement prohibits "[t]he use of motorized recreational vehicles in a manner that would harass wildlife or degrade or destroy wildlife habitat and/or agricultural land." The restrictions imposed by the district court are much broader. And the court cannot restrict the Bakers' usage further than the Amended Easement requires. *See People v. Wunder*, 2016

---

[5] As we understand Rhea's testimony, ripping and disking the road compaction is necessary to revegetate the travel surface.

COA 46, ¶ 26 (An injunction is overly broad "if it contains prohibitions which are unnecessary to effectuate the purposes of the injunction."); *Phx. Cap.*, 176 P.3d at 843. Furthermore, La Plata doesn't identify, and we haven't found, any evidence establishing that the additional vehicular limitations were necessary to remediate the injuries caused by the expansion of the road or to prevent the harassment of wildlife or the degradation or destruction of habitat along the road once it was returned to its preinjury state.

¶ 56 For these reasons, we reverse the portion of the Order limiting the motorized recreational vehicle use on the south road.

## V. Gate

¶ 57 At some point during their ownership, the Bakers installed or replaced a gate at the end of the south road. The district court concluded that the gate violated the Amended Easement and ordered the Bakers to remove it.

¶ 58 However, we agree with the Bakers that the district court erred by finding this violation and ordering the gate to be removed. The Amended Easement requires that, when

> a violation of the terms of this [Amended] Easement has occurred or is threatened, [La Plata] shall give written notice to [the Bakers]

30

of such violation and demand corrective action sufficient to cure the violation. . . . If [the Bakers] fail to cure the violation within thirty (30) days . . . [La Plata] may bring action at law or in equity . . . to enforce the terms of this [Amended] Easement, to enjoin the violation . . . and to require restoration of the Property . . . .

¶ 59 La Plata failed to issue the Bakers a violation notice regarding the gate. Therefore, La Plata is not entitled to request or receive injunctive relief related thereto. *Cf. Denver Ventures, Inc. v. Arlington Lane Corp.*, 754 P.2d 785, 788 (Colo. App. 1988) (holding court did not err by refusing to award damages to contractor because contractor failed to satisfy a notice and cure provision before terminating the contract and incurring costs to complete breaching subcontractor's work).

¶ 60 Accordingly, we reverse the portion of the district court's Order requiring the Bakers to remove the gate.

## VI. Fencing

### A. Additional Facts

¶ 61 The Original Easement allowed for grantors to construct fences so long as they were "consistent with agricultural uses, provided such fences are no higher than 42 inches, are not

composed of barbed or mesh wire, and meet the requirements of the Colorado Division of Wildlife for sound wildlife management practices." In contrast, the Amended Easement allows the grantors to construct fences that are consistent with agricultural uses so long as the fences "allow[] the reasonably natural and safe passage of wildlife across the Property."

¶ 62 The district court found, and the Bakers don't dispute, that the fence on the property's southern boundary was a "mesh wire fence approximately 4 [feet] tall." The fence on the northern boundary was "a wire fence at least 4 feet tall."

¶ 63 In the Order, the district court found that the fences "do not meet the wildlife-friendly guidelines prescribed by the Colorado Division of wildlife" and were "wildlife unfriendly." With respect to the southern boundary fence, the court ordered the Bakers to "either: 1) cut down [the fence] to a height of 42 inches, or 2) replace [the existing fence] with a strand wire fence not to exceed 42 inches in height, and otherwise meeting wildlife-friendly fencing guidelines of Colorado Parks and Wildlife." The court ordered the northern fence to be "replaced with a strand wire fence."

## B.    Violation and Injunctive Relief

¶ 64    On appeal, the Bakers argue that the district court erred by using the requirements of the Original Easement rather than the Amended Easement in finding that the fencing violated the easement and in ordering injunctive relief.  We conclude that additional findings are necessary.

¶ 65    Although not entirely clear from the Order, it appears that the district court relied on the fencing standards established in the Original Easement rather than the more flexible standards in the Amended Easement.  Specifically, instead of finding that the fencing did not "allow the reasonably natural and safe passage of wildlife" — the standard in the Amended Easement — the court found that the fencing "did not meet the guidelines prescribed by the Colorado Division of [W]ildlife" — the standard in the Original Easement.  The injunctive relief the district court ordered also appears to follow the standards from the original rather than the Amended Easement.

¶ 66    We acknowledge it is possible that (1) fences that violate the Colorado Division of Wildlife guidelines may also fail to allow the "reasonably natural and safe passage of wildlife," and (2) the

33

injunctive relief prescribed by the court may be necessary to allow

such passage. But the Order does not include sufficient findings

for us to determine if that is the case. Because of the lack of clarity,

we can't tell whether the district court applied the correct

contractual language in determining there was a violation or

whether the relief it afforded is overbroad. We therefore remand for

the court to make additional findings. Specifically, the court must

determine (1) whether the existing fences allow the reasonably

natural and safe passage of wildlife and (2) if not, what relief is

necessary for the fences to allow such passage.[6] If the court

intends to award mandatory injunctive relief, it must do so in an

equitable manner. *Supra* Part III.B.2. And as always, the court

must include sufficient factual findings for a reviewing court to

understand the basis of its ruling. *Plaza del Lago Townhomes Ass'n*

---

[6] To the extent La Plata suggests that we can affirm the district court's holding because some evidence supports a finding that the fences violated the Amended Easement, we decline that invitation. As discussed, it is unclear whether the district court in fact found that the fences violated the terms of the Amended Easement. While we can affirm a court's factual findings if supported by the record, we are without authority to make factual findings in the first instance. *See Kincaid v. W. Operating Co.*, 890 P.2d 249, 252 (Colo. App. 1994).

*v. Highwood Builders, LLC*, 148 P.3d 367, 372 (Colo. App. 2006) ("Nonetheless, the [district] court must 'make sufficient findings to enable the appellate court to clearly understand the basis of the [district] court's decision and . . . to determine the ground on which it rendered its decision.'" (quoting *Norton v. Raymond*, 491 P.2d 1403, 1404 (Colo. App. 1971))).

## VII.  Weeds

¶ 67     As part of its injunctive relief, the district court (1) ordered the Bakers to "continue to try to stop the spread of weeds" to the extent possible and (2) prohibited the use of "broadcast spraying" in riparian areas and in "other areas except where recommended in order to address large infestations."  We agree with the Bakers' assertion that this relief is overbroad.

¶ 68     Although La Plata issued the Bakers a violation notice related to the weeds, the district court did not conclude that the Bakers had violated the Amended Easement with respect to the weeds or that the weeds injured the property.  Instead, it recognized that (1) "weeds have been a problem on the property since the conservation easement was granted"; (2) "the Bakers have taken steps to stop the spread of weeds"; and (3) "eliminating all invasive

35

or noxious weeds is not realistically possible." Moreover, the Amended Easement doesn't require or prohibit specific methods of weed control, and the court made no finding that "broadcast spraying" or any other method of weed control would constitute a violation of the Amended Easement.

¶ 69 For these reasons, we conclude that the injunctive relief related to the weeds was overbroad, and we reverse that part of the Order. *See Wunder*, ¶ 26.

VIII. Additional Relief Requested by La Plata (Cross-Appeal)

¶ 70 In its post-trial motion, La Plata asked the district court to adopt a redlined version of the Order containing additional requested relief. The requested relief included

- orders for Rhea to prepare remediation, restoration, and revegetation plans for various areas of the property;
- orders for Rhea to prepare a weed management plan;
- orders for the Bakers to pay for Rhea's additional plans and to comply with them by the deadlines specified therein;
- additional specificity regarding the type of "grass seed mix" and "topsoil" used to revegetate the south road and other areas of the property;

- additional restrictions on the manner in which restoration of the south road would be carried out;

- deadlines for removal of the gate, replacement of the fencing, and completion of other tasks;

- additional limitations on vehicle movement around the property;

- orders for the Bakers to prepare, at their expense, a survey of the "amended building envelope" in which structures may be constructed; and

- orders giving La Plata the right to enter the Bakers' property with forty-eight hours' notice to monitor compliance with the restoration.

¶ 71 The district court constructively denied the motion, *see* C.R.C.P. 59(j), and La Plata appeals.

¶ 72 Initially, we note that many of La Plata's requests are moot given our reversal of the injunctive relief related to the agricultural area, gate, fence, and weeds. However, some of the requested relief pertains to the road or to relief ordered for violations that weren't appealed.

¶ 73    In its opening-answer brief, La Plata generally contends that the Order isn't sufficiently specific for it "to determine how some of the long-term rehabilitation plans will be accomplished and/or monitored to ensure they are performed completely."

¶ 74    As for La Plata's request to enter the Bakers' property with forty-eight hours' notice, we decline to address this portion of La Plata's argument as it is unpreserved because La Plata first made this in its post-trial motion. *See Briargate at Seventeenth Ave. Owners Ass'n v. Nelson,* 2021 COA 78M, ¶ 66 ("Arguments made, as here, for the first time in a post-trial motion are too late and, consequently, are deemed waived for purposes of appeal.").

¶ 75    As to the remaining issues, La Plata fails to articulate with any specificity why any of the additional items of relief it requested in the redline (1) will alleviate the alleged uncertainty in the Order; (2) are necessary to restore the property to its preinjury condition; (3) are permissible under the Amended Easement's terms; or (4) are supported by the record. It also doesn't explain why any of the deadlines it requests are reasonable in light of the tasks to which the deadlines are tied. Accordingly, we decline to address these arguments as undeveloped. *See Woodbridge Condo. Ass'n v. Lo*

*Viento Blanco, LLC*, 2020 COA 34, ¶ 41 n.12 ("We don't consider undeveloped and unsupported arguments."), *aff'd*, 2021 CO 56; *People v. Palacios*, 2018 COA 6M, ¶ 29 ("[I]t is not this court's function to speculate as to what a party's argument might be." (quoting *Beall Transp. Equip. Co. v. S. Pac. Transp.*, 64 P.3d 1193, 1196 n.2 (Or. Ct. App. 2003))).[7]

## IX. Prevailing Party and Attorney Fees and Costs on Appeal

¶ 76    Paragraph 6.6 of the Amended Easement provides,

> All reasonable costs incurred by [La Plata] in enforcing the terms of this [Amended] Easement against [the Bakers], including, without limitation, costs and expenses of suit and reasonable attorney's fees, and any costs of restoration necessitated by [the Bakers'] violation of the terms of this [Amended] Easement shall be borne by [the Bakers]; provided, however, that if [the Bakers] ultimately prevail[] in a judicial enforcement action, [the Bakers'] reasonable costs shall be borne by [La Plata].

---

[7] To the extent La Plata expands upon its arguments in its reply brief, we decline to consider those expanded contentions as well. *See In re Marriage of Dean*, 2017 COA 51, ¶ 31 ("We do not consider the arguments [the appellant] makes for the first time in her reply brief or those that seek to expand upon the contentions she raised in her opening brief.").

¶ 77    The Bakers contend that the district court erred by concluding that La Plata was the prevailing party in this litigation. The Bakers also contend that, under paragraph 6.6, La Plata is not entitled to recover fees related to the claimed violations on which the Bakers ultimately prevailed. In addition, each party asserts that the fee-shifting provision entitles them to attorney fees and costs on appeal.

¶ 78    As to the district court's prevailing party determination and whether the Amended Easement entitles La Plata to an award of fees as an overall prevailing party (notwithstanding that it didn't prevail on some individual claims), we conclude that we do not have jurisdiction over this portion of the appeal because the attorney fees order was not final at the time the appeal was filed, and no amended notice of appeal was filed to include the final attorney fees order. *See USIC Locating Servs. LLC v. Project Res. Grp. Inc.*, 2023 COA 33, ¶ 34 (an award of attorney fees, which is distinct and separately appealable from a judgment on the merits, is nonfinal until the district court has determined the amount of the fees). We note that the attorney fees award is the subject of a separate appeal, *La Plata Open Space Conservancy v. Baker*, (Colo. App. No.

40

24CA677 filed Apr. 18, 2024), in which the Bakers have raised identical issues. Because that appeal contains a final appealable order as to attorney fees, that case is the more appropriate vehicle to determine these issues.

¶ 79 Because we reverse and remand for further proceedings on several issues and because interpretation of the attorney fees provision is not before this division, it would be premature to award appellate attorney fees at this time. *See Bedard v. Martin*, 100 P.3d 584, 593-94 (Colo. App. 2004). We therefore direct the district court to consider the parties' requests for appellate fees following the remand proceedings. *See id.*

¶ 80 La Plata also requests its appellate costs under C.A.R. 39. However, because La Plata only partially prevailed on appeal, we decline to assess costs against the Bakers. *See id.*; *In re Marriage of Beatty*, 2012 COA 71, ¶ 23.

## X. Disposition

¶ 81 The judgment is affirmed in part and reversed in part, and the case is remanded with directions.

JUDGE HARRIS and JUDGE BROWN concur.